```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
STARR INDEMNITY & LIABILITY COMPANY,  :
                                      :        13cv742 (DLC)
                 Plaintiff,           :
         -v-                          :     OPINION AND ORDER
                                      :
AMERICAN CLAIMS MANAGEMENT, INC.,     :
                                      :
                 Defendant.           :
                                      :
------------------------------------- X
```

APPEARANCES:

For plaintiff Starr Indemnity & Liability Company:

Thomas J. McCormack
Seth M. Kruglak
Michael A. Samalin
CHADBOURNE & PARKE LLP
1301 Avenue of the Americas
New York, NY 10019

David M. Raim
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036

Eric D. Freed
Lezlie Madden
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103

For defendant American Claims Management, Inc.:

Thomas Cahill
Joshua M. Rubins
Justin Klein
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, NY 10169

1

DENISE COTE, District Judge:

Defendant American Claims Management Inc. ("ACM") has moved for summary judgment on certain claims brought by plaintiff Starr Indemnity & Liability Company ("Starr").  For the reasons that follow, the motion is denied.

BACKGROUND

In this action, Starr, an insurer, seeks to recover damages from ACM, the company that administered claims brought by insureds under Starr's non-standard automobile insurance policy, a high-risk insurance program implemented in accordance with the Personal Injury Protection ("PIP") section of the Michigan No-Fault Insurance Act.  Starr alleges that ACM improperly adjusted PIP claims so as to pay benefits to claimants before obtaining reasonable proof that the alleged losses were compensable or had even occurred.  According to Starr, ACM's errors in handling various claims resulted in what is known in the insurance industry as "leakage" -- paying more than necessary to resolve a claim, whether due to inefficiency, process malfunction, human error, fraud, or other causes.

Starr contends that ACM's poor handling of these claims violated standards of professional reasonableness and the parties' Claims Services Agreement ("Agreement").  The Agreement, which became effective on January 1, 2010 and is

governed by New York law, required ACM to have qualified
personnel investigate, adjust, administer, and pay non-standard
auto claims in accordance with all laws, rules, regulations,
industry practices, and ACM guidelines.

At present, this action involves thirty-three insurance
claims that ACM administered on behalf of Starr.  ACM has
limited its summary judgment motion to twelve claims ("the
Claims"), which represent eighty-five percent of the total
damages sought by Starr.

DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show[] that there is no genuine
dispute as to any material fact" and that ACM, the movant, "is
entitled to judgment as a matter of law."  See Fed. R. Civ. P.
56(a).  ACM bears the burden of demonstrating the absence of a
material factual question, and, in making this determination,
all facts are viewed in the light most favorable to Starr and
all reasonable inferences are drawn in Starr's favor.  See
Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 456
(1992); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).
If ACM has asserted facts showing that Starr's claims cannot be
sustained, Starr must "set out specific facts showing a genuine
issue for trial" and cannot "rely merely on allegations or

3

denials" contained in the pleadings.  See Fed. R. Civ. P. 56(e);
Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Nor may
Starr "rely on mere speculation or conjecture as to the true
nature of the facts to overcome a motion for summary judgment,"
as "[m]ere conclusory allegations or denials cannot by
themselves create a genuine issue of material fact where none
would otherwise exist."  See Hicks v. Baines, 593 F.3d 159, 166
(2d Cir. 2010) (citation omitted).

   Starr's complaint contains one count for "breach of
contract," one count for "negligence and/or professional
negligence," and one count for "breach of warranty."  ACM
contends, and Starr does not dispute, that, whether Starr's
claims sound in contract or in tort, Starr must prove, among
other things, that ACM's conduct was a but-for cause resulting
in damages.  ACM moves for summary judgment on the elements of
factual causation and damages, arguing that the record lacks
material creating triable issues on those elements.  Due to this
lack of evidence, ACM asserts that Starr is left to rely on mere
speculation to overcome the summary judgment motion.

   To deny ACM's motion, it suffices to show that the record
contains material creating triable issues on causation and
damages with respect to the twelve Claims.  Thus, the following
discussion of the twelve Claims presents but a few

representative key facts from which a jury could reasonably draw the inference that ACM's conduct caused Starr to suffer damages.

Before that discussion, however, a word on one piece of evidence in the record -- the report of Starr's expert, Alan Gray.  ACM explicitly has not made a motion in limine under Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993), to exclude Gray's report.  Instead, ACM argues that Gray's report is simply an attempt to convert Starr's version of the facts into expert testimony and that, in any case, Gray's report raises no triable issues of fact as to causation or damages.  ACM's arguments with respect to Gray's report need not be considered at this juncture, because the record contains submissions that Starr represents it will admit through fact witnesses from which a jury could reasonably infer that ACM's conduct caused Starr ultimately to pay more than it otherwise would have on the twelve Claims.  Those submissions, consisting of police reports, files from ACM and Starr, and the like, form the basis of the ensuing discussion of the twelve Claims.

1. Cusick Claim

The police records from the car accident of claimant Janice Cusick reported no passengers in the car other than Cusick, who was driving.  And when Cusick first reported the accident to ACM, she mentioned no passengers.  Nonetheless, without further

investigation, ACM paid benefits on claims received from four purported passengers of Cusick's vehicle.

ACM argues that it would take sheer speculation for a jury to infer from these facts that ACM's conduct caused Starr damages.  After all, says ACM, while there may be scant proof that there <u>were</u> passengers in Cusick's car, there is also little proof that there were <u>not</u> passengers in the car.  Additionally, ACM argues that, because the four purported passengers in fact proved to be litigious (filing suit after further benefits were denied), had ACM initially denied their claims, they would have forced a settlement and Starr would have incurred costs anyway. ACM's arguments with respect to the Cusick Claim are representative of the general position taken by ACM in its motion.

Here, the inference that Starr would like the jury to draw from the evidence -- that ACM's conduct was a but-for cause of damages sustained by Starr -- while by no means compelled, is also not the product of "mere speculation."  Rather, it is one reasonable inference that a jury could draw.  Thus, the Cusick Claim, like the other Claims discussed below, is not amenable to summary resolution.

2. <u>Johnson Claim</u>

ACM began paying benefits to claimant Monique Johnson three

weeks after receiving demands even though, during the first seven months that the Claim file was open, ACM did not speak to Johnson or order the police report, photographs, or an independent medical examination ("IME").  Similarly, ACM paid lost wages to Johnson despite red flags indicating that she may not have actually been employed at the time of the accident and without obtaining a wage authorization.

ACM argues that Johnson demonstrated a penchant for litigation (pursuing additional benefits beyond those initially awarded) that would have been exercised regardless of how ACM adjusted the Claim, leading to expenses on Starr's behalf.  But a jury could reasonably choose to credit Starr's version of the facts, in which proper investigation by ACM would have led to fewer benefits being paid.  That is enough to defeat the summary judgment motion as to this Claim.

3. <u>Finch Claim</u>

Andre Finch and another individual were apparently involved in a hit-and-run accident at a time when neither was insured by Starr.  Two days after this incident, Finch purchased a Starr policy.  Then, about a month later, both individuals filed a police report about a second purported hit-and-run accident with suspicious similarities to the first one.  ACM's own claims adjuster recommended that, because of signs of potential fraud,

ACM deny coverage on the Claim brought by the two claimants.
Despite the adjuster's recommendation against payment, ACM began
disbursing benefits on this Claim.  Indeed, during the period in
which payments were being made, ACM personnel continued to state
that the Claim should be denied and no benefits paid because of
the suspicious circumstances.

ACM points out that the Finch claimants are plaintiffs in
ongoing litigation against Starr, and suggests that Starr may
choose to pursue settlement due to concerns about taking the
case to a jury.  The implication is that, regardless of ACM's
administration of the Finch Claim, Starr was bound to pay
benefits one way or another.  The details of the ongoing Finch
litigation may indeed be relevant to Starr's claims against ACM
in this case, but the mere fact of that litigation standing
alone is not enough to warrant summary dismissal.  It is for a
jury to decide whether ACM's conduct caused Starr to pay excess
benefits through leakage.

4. Al-Mohammed Claim

ACM received a report that seven members of the Al-Mohammed
family had been involved in a hit-and-run rear ending.  Although
no injuries were initially reported, ACM recognized the need to
rule out injuries to the claimants.  Despite this
acknowledgment, ACM made only one attempt to contact the insured

before closing the Claim file without any investigation.  Two
months after the accident was reported, ACM began receiving
medical bills for all seven claimants and reopened the Claim
file.  ACM began paying benefits to the claimants before
obtaining the police report, making contact with the insured,
taking statements from the claimants, receiving pictures of the
car, ordering IMEs, or receiving any proof that the claimants
were injured in the accident.

ACM points to the fact that after benefits were eventually
cut off, the claimants sued Starr and obtained a settlement for
further benefits.  But Starr could have settled with the
claimants for any number of strategic reasons, and there would
be nothing inconsistent about Starr paying benefits to the
claimants yet recovering from ACM for leakage.  This will come
down to a jury question that is not appropriate for summary
resolution.

5. Cammon Claim

Roberta Cammon, the insured, and a passenger were allegedly
involved in a hit-and-run accident.  Cammon's Starr insurance
policy had been reinstated three days prior to the alleged
accident, the policy was cancelled shortly after the alleged
accident, and over a month elapsed before the accident was
reported.  Despite these indicia of fraud, ACM did not contact

9

the insured for nine days, did not involve its Special
Investigative Unit for almost two months, and did not schedule
IMEs until four months after the accident.  It was not until
five months after the accident that ACM's own IME doctor made
findings indicating that treatment should have ceased within six
weeks, and it was not until seven months after the accident that
ACM's investigators determined that the Claim was suspicious and
that it was questionable if the loss had even occurred.  By that
time, ACM had paid for extensive treatment.

ACM notes that the Cammon claimants eventually filed suit
against Starr seeking further benefits and that, as a result,
Starr paid an arbitration award.  Again, this fact does not
forestall a jury finding that ACM's conduct was a but-for cause
of leakage paid by Starr.  For instance, a jury could reasonably
infer from the record evidence that Starr's negotiating posture
in the litigation and arbitration with the Cammon claimants was
negatively impacted by ACM's initial handling of the Claim.

6. <u>Morrison Claim</u>

The record indicates that Michele Morrison and another
claimant reported suffering injuries from a car accident on July
11, 2010.  ACM began making payments on the Claim in November
2010, but did not establish contact with either claimant and did
not speak to the claimants' attorney until December 2010.  ACM

paid benefits from November 2010 through May 2012.  During that period, in July 2011, noting that the claimants had been treated for almost a year without an IME, Starr asked ACM to schedule one.  It took ACM four months to schedule an IME for Morrison, and the other claimant never received an IME.  The Morrison IME, which was completed in January 2012, concluded that she no longer needed treatment and that her injuries were of a type that would typically have resolved within six to twelve weeks and that would not last indefinitely.

ACM notes that after Morrison's benefits were terminated, litigation ensued in which Starr approved a settlement payment. As explained above, however, this fact does not serve to render summary judgment appropriate on the question of whether ACM's conduct caused Starr to pay leakage.  After all, the record contains evidence -- of ACM's potential mishandling of the Claim -- from which a jury could reasonably infer an affirmative answer to that question.

    7. <u>Anderson Claim</u>

Pursuant to the Agreement, ACM was to consult Starr on any claim involving coverage determinations, over which Starr was to have the final say.  Carmencita Anderson, who was the driver at the time of an alleged car accident, had a Starr policy that was meant to exclude her as a driver, though she had not signed the

relevant "Notice of Driver Exclusion" form.  ACM did not consult
Starr on the coverage determination and began paying benefits to
Anderson.

ACM argues that, had Starr denied coverage, the claimant
would probably have sued, necessitating expense on Starr's part
anyway.  This argument, like others of ACM's, raises factual
issues that are ultimately for the jury to decide.  For
instance, ACM says that, had Starr refused coverage and ended up
losing a lawsuit to Anderson, Starr would have ultimately paid
much more, in part because of Michigan statutory fee-shifting
provisions that may have been implicated.  That is one possible
inference that a jury could draw from the evidence.  Another
reasonable inference, and the one that gets credited at this
stage in this litigation, is that, had ACM consulted with Starr,
a no-coverage position would have been adopted and could have
been defended in any ensuing litigation.

    8. <u>Alkabi Claim</u>

The record indicates that Aquil Alkabi and four alleged
passengers made a Claim to ACM in relation to an alleged hit-
and-run accident.  The police report of the accident stated that
Alkabi was the only individual in the car.  The individual who
reported the loss provided ACM the police report number for the
alleged accident.  Nevertheless, ACM did not obtain the police

report until fourteen months after receiving notice of the loss.
ACM also failed to make voice-to-voice contact with Alkabi or
the other claimants during the entire period that ACM was paying
benefits.  ACM began paying benefits before speaking with the
claimants or obtaining a police report or vehicle photos.  An
ACM claims adjuster later admitted that no investigation was
performed prior to her taking over the case more than a year
after the accident was reported.

　　　ACM does not deny its failures in adjusting the Alkabi
Claim.  After all, the bulk of the litigation filed by the
Alkabi claimants when their benefits were eventually terminated
was ultimately dismissed on the ground of the claimants'
fraudulent behavior.  ACM instead argues that had benefits been
denied from the start, these claimants would likely have sued
and, regardless of the outcome of the suit, Starr would not have
been spared the expense of investigation and litigation.  This,
of course, does not change the fact that a jury could reasonably
infer from the evidence that ACM's decision to make payments in
the face of red flags, and without investigating certain
matters, caused Starr to pay leakage.  Thus, summary judgment is
not warranted as to this Claim.

　　　9. Jacobs/Castro Claim

　　　Priscilla Castro, the claimant, was involved in an auto

13

accident.  Castro's brother-in-law, Eduardo Jacobs, was the insured.  The record indicates that ACM began paying Castro's medical bills without speaking to either Castro or Jacobs. Furthermore, ACM did not perform an IME until seven months after being notified of the accident.  The IME concluded that there was no evidence of injury beyond a minor issue that would have healed within six to eight weeks.

Although these claimants did not file suit after ACM belatedly terminated their benefits, ACM asserts that, had it performed its contractual and professional duties with appropriate diligence, the claimants would not have "gone away" and would have sued Starr, causing Starr to incur the same losses.  This argument, like those discussed above, serves to raise a jury question on which summary judgment is inappropriate.

   10. Strubank Claim

The record indicates that ACM paid Michael Strubank unabated benefits following a minor car accident, including for physical therapy during a ten-month period despite the fact that Strubank was prescribed physical therapy for only six to eight weeks.  ACM did not schedule an IME until eight months after receiving report of the accident, and the IME doctor concluded that Strubank did not require any additional testing, treatment,

14

or care.

ACM argues that, if Strubank's benefits had been terminated at the appropriate time, he might have pursued further benefits through litigation. But, even accounting for any litigation that Strubank may have pursued, there is sufficient evidence in the record from which a jury could reasonably infer that ACM's administration of the Strubank Claim caused Starr to pay leakage.

### 11. Brown Claim

Pursuant to ACM policy, to be eligible for benefits, an applicant must disclose other insurance policies that he or she has. D'Vaughnna Brown, the claimant, was in a car accident. Brown's mother, the insured, informed ACM that she had health insurance through a primary coverage provider and would file Brown's Claim with that insurer. The ACM claims adjuster made a note that the priority of coverage between Starr and the health insurer needed to be determined. Nonetheless, apparently without resolving the issue of priority, ACM began making payments. In fact, ACM paid benefits for nearly two months before even receiving the application that disclosed the health insurance information. Moreover, ACM did not question Brown's mother as to whether she had submitted the Claim to the health insurer.

15

ACM argues that even had it investigated the priority of coverage, Starr may have been ensnared in coverage disputes, which would have forced it to spend just as much as it did. That is a factual issue for a jury to decide, rendering summary judgment inappropriate here.

12. <u>Redder/Williams Claim</u>

Lisa Williams, the claimant, was involved in an accident while driving alone in a car on which Redder Lee,[1] the insured, had a Starr policy.  The record indicates that ACM began paying benefits on this Claim two months after the accident.  It was not until five months after the accident that the ACM adjuster realized that there was a potential priority of coverage issue. Nonetheless, ACM continued to make payments, and, indeed, continued paying even after the ACM adjuster apparently concluded that the claimant's health insurer had priority.

ACM again argues that, regardless of how it proceeded in investigating the priority issue, Starr may have been ensnared in coverage disputes.  But that is for a jury to decide.  There is evidence in the record from which a jury could reasonably infer that ACM's handling of this Claim led Starr to pay leakage.

---

[1] It is not clear from the record whether "Redder" is the insured's first or last name, but the parties refer to the Claim as the "Redder/Williams Claim," and that label is adopted here.

CONCLUSION

In sum, Starr can point to fact evidence from which a jury could reasonably infer that ACM's mishandling of each of the twelve Claims caused Starr to pay leakage that it otherwise would not have paid.  ACM will no doubt argue to a jury that the fact evidence admits of multiple interpretations and that, for any number of reasons, in the counterfactual world in which ACM behaved differently, Starr may have ultimately paid out the same amounts on the Claims.  To offer this summary is to show why summary judgment is not warranted here:  Drawing all reasonable inferences in Starr's favor, there is a genuine dispute as to the proper interpretation of the facts that are material to the causation and damages elements of Starr's claims.  Accordingly, ACM's July 11, 2014 motion is denied.

SO ORDERED:

Dated:    New York, New York
          November 21, 2014

_____
DENISE COTE
United States District Judge

17